# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00130-CV

---

**David Polston; Inland Environmental and Remediation, Inc.; Inland Recycling, L.L.C.; and Boundary Ventures, Inc., Appellants**

**v.**

**The State of Texas, Lower Colorado River Authority, and Colorado County, Texas, Appellees**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-19-002002, THE HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

Appellants David Polston, Inland Environmental and Remediation, Inc., Inland Recycling, L.L.C., and Boundary Ventures, Inc., appeal from the trial court's modified temporary injunction (the TI or the modified TI), entered in a suit by appellees the State of Texas, the Lower Colorado River Authority (LCRA), and Colorado County, Texas (collectively, the State).[1] We affirm the modified TI.

### PROCEDURAL BACKGROUND

Polston is the president of Inland Environmental and Remediation, Inland Recycling, and Boundary Ventures. Appellants own and/or operate a waste-processing facility that accepts waste, including oil and gas waste, hazardous waste, and industrial solid waste, and

---

[1] The State filed this suit, and LCRA and Colorado County later intervened.

processes it into material that is used as road base. The facility covers 300 acres and has frontage on Skull Creek, which is a tributary of the Colorado River, and operates under permits issued by the Railroad Commission of Texas (Railroad Commission or Commission).

On February 8, 2019, the Texas Commission for Environmental Quality (TCEQ) received complaints that Skull Creek "was running black with a pungent smell downstream of" the site. The next day, a Texas Parks and Wildlife Department employee observed about twenty-five dead fish downstream of the facility "with a moderate to strong chemical or petroleum odor." TCEQ investigated and found "rampant mismanagement of waste" at the facility—waste was improperly stored; containers were leaking; and a washout area lacked a containment wall, "effectively allowing liquid waste to flow out of the washout area." TCEQ notified appellants of the problems, and ten days later, appellants responded that they had addressed TCEQ's demands. However, on March 22, 2019, TCEQ received a new batch of citizen complaints, and when TCEQ investigators responded, they "found the mismanagement of waste documented on February 12, 2019, was unabated." Toxicology reports of water samples from the area showed various substances at levels that were "potentially lethal to fish and render[ed] fish unsafe for human consumption" and "potentially unsafe for ingestion or skin contact."

In April 2019, the State, on behalf of its citizens and TCEQ, sued, alleging that appellants had violated the water code by discharging waste from their recycling facility into public waters and had not addressed the violations or taken steps to stop further discharges. The State sought statutory penalties and injunctive relief to "protect the quality of water in the state." The trial court signed two temporary restraining orders barring appellants from discharging or accepting waste at the facility and ordering them to stop storage and processing at the site.

2

In mid-May 2019, the trial court held a hearing on the State's application for a temporary injunction, with the State providing evidence of improperly stored waste at the facility and that Skull Creek had turned black downstream from the facility, resulting in fish kills. On the second day of the hearing, appellants and the State negotiated an agreed temporary injunction (the agreed TI), which the court signed on May 14, 2019. In July 2019, the State filed an amended petition on behalf of Texas's citizens, TCEQ, and the Railroad Commission, and in mid-August, it filed a motion for contempt asserting that appellants had not complied with the agreed TI. About two weeks later, appellants moved to modify the agreed TI, asserting that because the Commission was now a party to the proceeding, it should be required to complete a closure plan for the facility, use surety bond funds to conduct "remedial measures" proposed by appellants, and take other steps to address the environmental contamination alleged at the site. Appellants also asked the court to extend deadlines and to allow the transfer of containers to third parties willing to accept them for recycling.

In mid-December 2019, the trial court heard the State's motion for contempt, appellants' motion to stay due to Polston's filing for bankruptcy, and a motion to dissolve the agreed TI filed by appellants. The court took the stay under advisement and denied appellants' motion to dissolve, moving on to the motion for contempt and hearing testimony from multiple witnesses about appellants' compliance with the agreed TI or lack thereof and about the state of the facility and Skull Creek downstream. At the conclusion of the hearing, the court said:

> I think there are the big-picture questions, as I said before, the look back of what is appropriate to address the failure to comply with the Agreed Temporary Injunction, which everybody acknowledges is happening. And then look forward of how do we modify the Temporary Injunction going forward to have something that is practical that does not set everybody up for failure.

3

The court disagreed that it lacked authority to modify the injunction, saying, "[T]he parties agreed to allow modification to take place, so, come on," and asked for proposed modifications.

On January 24, 2020, the trial court reconvened the hearing and said that it had worked through the competing proposals for the modified TI. The State noted that Boundary Ventures was not a party when the agreed TI was signed and that it had since been brought in as a defendant. The State also noted that Boundary had held a Commission permit and obtained the surety bond as part of the permitting process; that Boundary notified the Commission in 2017 that it was not going to operate and thus was not going to renew the permit; that appellants did not close the facility; and that the Commission sued to obtain the surety funds in a separate proceeding. At the conclusion of the January 2020 hearing, the trial court signed the State's proposed modified TI, which included Boundary Ventures, enjoining appellants from accepting waste at the site, storing or processing waste in a manner that results in discharge into the water, disposing of waste at the site, or discharging waste. Under the modified TI, which the State argues actually reduces appellants' obligations, appellants are required to, among other things, maintain a cap at a discharge pipe; contact entities that stored or disposed of waste at the site to have the waste removed and transported to another facility; and abate and contain all spills and discharges at the site. Appellants are further required to engage an engineer or geoscientist to do site investigations, to inventory and map waste at the site, to identify and test all containers for hazardous waste, to inspect containers to be sure they are properly maintained, to put certain kinds of waste in appropriate storage, to ensure that any waste within a certain distance from Skull Creek is properly stored, and to construct berms to protect a lake called 50-Acre Lake from discharge.

4

## STANDARD OF REVIEW AND RELEVANT STATUTES

A temporary injunction is intended "to preserve the status quo of the litigation's subject matter pending a trial on the merits" and "is an extraordinary remedy and does not issue as a matter of right." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The grant or denial of a temporary injunction is within the trial court's sound discretion, and we may not substitute our judgment for that of the court unless its "action was so arbitrary that it exceeded the bounds of reasonable discretion." *Id*. The trial court does not abuse its discretion if some evidence reasonably supports its decision, *id*. at 211, even if the evidence is conflicting, *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 878 (Tex. App.—Austin 2018, no pet.). An appeal from a temporary injunction "does not present the merits of the underlying case for review, but only whether the trial court abused its discretion in determining whether or not the applicant is entitled to preservation of the status quo pending determination of those merits." *Id*.

Generally, an applicant for a temporary injunction must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. However, the State's inability to enforce its "duly enacted [laws] clearly inflicts irreparable harm on the State." *Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied) (quoting *Abbott v. Perez*, __ U.S. __, 138 S.Ct. 2305, 2324 n.17 (2018)); *see Washington v. Associated Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 319 (Tex. App.—San Antonio 2021, no pet.) ("Like the trial court, our sister court, and the Supreme Court, we agree that the 'inability [of a state] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State.'" (quoting *Abbott*, 138 S.Ct. at 2324 n.17, and *Texas Ass'n of Bus.*, 565 S.W.3d at 441)). And "when an applicant relies upon a statutory source for injunctive relief, . . . the

5

statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law." *West v. State*, 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.); *see White Lion Holdings, L.L.C. v. State*, No. 01-14-00104-CV, 2015 WL 5626564, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2015, pet. denied) (mem. op.).

Unless authorized by TCEQ or certain other entities, a person may not discharge sewage, pollutant, or municipal, recreational, agricultural, or industrial waste "into or adjacent to any water in the state"; may not discharge other waste if it causes or will cause "pollution of any water in the state"; and may not "commit any other act or engage in any other activity which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state." Tex. Water Code § 26.121(a), (d), (e).[2] In addition, under the Texas Hazardous Substances Spill Prevention and Control Act, in the event of a spill or discharge of hazardous substances into state waters, the owner or operator of the facility "shall immediately undertake all reasonable actions to abate and remove the discharge or spill" and, if the responsible person fails to do so or responds inadequately, TCEQ "may

---

[2] "Waste" is statutorily defined as "sewage, industrial waste, municipal waste, recreational waste, agricultural waste, or other waste," Tex. Water Code § 26.001(6); "industrial waste" is a byproduct of "any process of industry, manufacturing, trade, or business," *id*. § 26.001(11); "pollutant" includes solid waste, chemical waste, sand, and industrial waste discharged into state waters, *id*. § 26.001(13); and "pollution" is "the alteration of the physical, thermal, chemical, or biological quality of, or the contamination of, any water in the state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property or to public health, safety, or welfare, or impairs the usefulness or the public enjoyment of the water for any lawful or reasonable purpose," *id*. § 26.001(14). "Discharge or spill" is defined as an act or omission, other than one authorized by permit or regulated by the Railroad Commission, "by which hazardous substances in harmful quantities are spilled, leaked, pumped, poured, emitted, entered, or dumped onto or into waters in this state or by which those substances are deposited where, unless controlled or removed, they may drain, seep, run, or otherwise enter water in this state." *Id*. § 26.263(1).

6

undertake the removal of the discharge or spill and may retain agents for these purposes who shall operate under the direction of the executive director." *Id*. § 26.266(a), (b). "If it appears that a violation or threat of violation of a statute within [TCEQ's] jurisdiction . . . has occurred or is about to occur," TCEQ may initiate a lawsuit "for injunctive relief to restrain the violation or threat of violation." *Id*. § 7.032(b); *see also id*. § 7.105(b)(1) (if person "is alleged to be making or to have made an unauthorized discharge of waste into or adjacent to the waters in the state at a new point of discharge without a permit in violation of state law," TCEQ shall request initiation of enforcement suit). The trial court may grant TCEQ "any prohibitory or mandatory injunction the facts may warrant, including a temporary restraining order and, after notice and hearing, a temporary injunction or permanent injunction." *Id*. § 7.032(d). TCEQ may also seek administrative, civil, and criminal penalties. *See, e.g.*, *id*. §§ 7.051, .052, .102, .103, .145, .147.

TCEQ also has jurisdiction over solid waste under the Solid Waste Disposal Act, *see, e.g.*, Tex. Health & Safety Code § 361.017 (TCEQ's jurisdiction over industrial solid waste and hazardous municipal waste), *see also id.* § 371.028 (TCEQ must adopt rules and procedures to implement used-oil recycling program), and may sue for injunctive relief if it believes a person is improperly releasing or threatening to release solid waste, *see id*. § 361.273. TCEQ has promulgated rules governing industrial solid waste, including providing that "no person may cause, suffer, allow, or permit any activity of storage, processing, or disposal of any industrial solid waste or municipal hazardous waste unless such activity is authorized by" TCEQ or another entity. 30 Tex. Admin. Code § 335.2(a) (Tex. Comm'n on Env't Quality, Permit Required). In addition, a person may not "cause, suffer, allow, or permit the collection, handling, storage, processing, or disposal of industrial solid waste or municipal hazardous waste" so as to cause an unauthorized "discharge or imminent threat of discharge" of the waste "into or adjacent to the

7

waters in the state," a nuisance, or "the endangerment of the public health and welfare."  *Id*. § 335.4 (Tex. Comm'n on Env't Quality, General Prohibitions).  Similarly, a person may not allow "the collection, storage, transportation, processing, or disposal of municipal solid waste" or use a solid-waste facility to store, process, or dispose of solid waste in violation of statute or rule in a way that causes an unauthorized discharge or imminent threat of discharge of municipal solid waste into state waters, a nuisance, or "the endangerment of the human health and welfare or the environment."  *Id*. § 330.15(a) (Tex. Comm'n on Env't Quality, General Prohibitions).[3]

Meanwhile, the Railroad Commission is empowered to "prevent pollution of surface water or subsurface water in the state" with regard to oil and gas wells, the production of oil and gas, and "the discharge, storage, handling, transportation, reclamation, or disposal of oil and gas waste . . . or of any other substance or material associated with any operation or activity regulated by" the Commission.  Tex. Nat. Res. Code § 91.101; *see id*. § 91.1011 (defining "oil and gas waste").  The Commission has the authority to enforce statutes under its jurisdiction, "including the authority to seek and obtain civil penalties and injunctive relief."  *Id*. § 91.003(a); *see id*. § 91.002 (person who violates section 91.101 or Commission rule, order or permit may be subject to criminal penalties).

---

[3]  "Special waste," a kind of municipal solid waste, is any solid waste or combination of solid wastes that due to its quantity, concentration, or characteristics "requires special handling and disposal to protect the human health or the environment."  30 Tex. Admin. Code § 330.3(154) (Tex. Comm'n on Env't Quality, Definitions).  Special wastes include certain industrial nonhazardous wastes; "wastes from commercial or industrial wastewater treatment plants; air pollution control facilities"; "tanks, drums, or containers used for shipping or storing any material that has been listed as a hazardous constituent" but not as a commercial chemical product; "soil contaminated by petroleum products, crude oils, or chemicals in" certain concentrations; used oil; "waste from oil, gas, and geothermal activities subject to regulation by the [Railroad Commission] when those wastes are to be processed, treated, or disposed of at a solid waste management facility authorized under this chapter."  *Id*.

8

**DISCUSSION**

Appellants assert six issues on appeal: that the trial court abused its discretion in entering the TI because there were no findings of a statutory violation or threatened violation and no evidence to support such a finding; that the TI effectively and improperly grants appellees substantially all of the permanent injunctive relief they sought; that although the TI purports to enjoin appellants from violating the law, the central question in the proceeding is whether the enjoined conduct was a violation of the law; that the TI is void because it does not adequately explain the reasons for its issuance; that the TI requires appellants to take affirmative steps and alter the status quo with no showing of extreme necessity or hardship to justify such a requirement; and that the TI is overbroad because it improperly enjoins Boundary Ventures, "a party against whom no party has applied for a temporary injunction," defines "waste" in a vague and overbroad manner so as to bar appellants from engaging in lawful activities, and defines "site" "in a manner that makes the injunction overbroad."

As an initial matter, we disagree with the State's assertion that we should not consider complaints that could also have been brought against the agreed TI.[4] "[A]n order that modifies a temporary injunction is the equivalent of an order that dissolves a temporary injunction and grants a new one." *West I-10 Volunteer Fire Dep't v. Harris Cnty. Emergency Servs. Dist. No. 48*, 507 S.W.3d 356, 358-59 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

---

[4] The State, observing that appellants negotiated and agreed to the terms of the agreed TI and did not take an appeal, argues that appellants have waived any complaints against the modified TI that could also have been raised against the agreed TI. Appellants argue that such a holding would work against public policy by discouraging parties from attempting to find a path that would benefit everyone, "even those that would not properly be included in an injunction, under the (mistaken) belief they had the financial ability to complete those tasks."

9

We thus consider the entire modified TI rather than only terms that differ substantially from those of the agreed TI.

### 1. Did the State present sufficient evidence of statutory violations?

In their first issue, appellants challenge whether the State presented sufficient evidence that appellants violated or threatened to violate the applicable statutes. Appellants first insist that because the State relied on statutory violations to justify its request for injunctive relief, which appellants concede "obviate[es] the need to establish the elements of irreparable harm and lack of adequate remedy by law," *see Texas Ass'n of Bus.*, 565 S.W.3d at 441, the State was required to show "more than just a probable right to recovery" and instead had to "establish by conclusive evidence" that appellants had violated or threatened to violate any relevant statutes. For support, they cite cases holding that when there is a conclusive showing of a violation of the law, the trial court lacks discretion to do anything other than enjoin the violation. *See San Miguel v. City of Windcrest*, 40 S.W.3d 104, 107 (Tex. App.—San Antonio 2000, no pet.); *City of Georgetown v. Days Inn of Georgetown*, No. 03-99-00010-CV, 1999 WL 670709, at *2 (Tex. App.—Austin Aug. 31, 1999, no pet.) (not designated for publication); *Priest v. Texas Animal Health Comm'n*, 780 S.W.2d 874, 876 (Tex. App.—Dallas 1989, no writ); *City of Houston v. Memorial Bend Util. Co.*, 331 S.W.2d 418, 422 (Tex. App.—Houston 1960, writ ref'd n.r.e.). However, the fact that a trial court *must* enjoin violations of the law that are conclusively shown does not mean that a trial court *may not* issue an injunction against statutory violations when the evidence supports a conclusion that the defendants are likely violating the law but does not conclusively establish that fact. We thus disagree that the State was required to

establish actual or threatened violations of the law "by conclusive evidence" before a temporary injunction could be issued.

Appellants also argue that the TI "contains no findings by the trial court that Polston or Inland violated or threatened to violate any statute or regulation."[5] Relatedly, in their third issue, appellants argue that the TI violates Texas Rule of Civil Procedure 683 because it does not adequately state the reasons for issuance.

Rule 683 provides:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Tex. R. Civ. P. 683. "[T]he obvious purpose of [Rule 683] is to adequately inform a party of what he is enjoined from doing and the reason why he is so enjoined." *Texas Health & Hum. Servs. Comm'n v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615, 628 (Tex. App.—Austin 2013, no pet.) (quoting *El Tacaso, Inc. v. Jireh Star, Inc.*, 356 S.W.3d 740, 744 (Tex. App.—Dallas 2011, no pet.)).

The TI states that it is intended to:

> enforce and enjoin violations of the Texas Water Code, the Texas Health and Safety Code, the Texas Natural Resources Code, and rules promulgated thereunder by the TCEQ and [the Railroad Commission], which control the

---

[5] Appellants assert that the trial court "expressly declined" to make a finding of fact that there was a violation or threatened violation of law. However, after appellants filed a request for findings of fact and conclusions of law, the trial court declined, sending the parties a letter stating that it "need not file findings of fact and conclusions of law in appeals of interlocutory orders." We do not view that decision as commenting on whether the court had found that appellants had violated or threatened to violate one of the environmental statutes.

11

> quality of water in the state and the management of solid waste, hazardous waste and oil and gas wastes pertaining to the Defendants' facility . . . , and to assess and initiate remediation of environmental contamination present at the facility.

Appellants argue that this statement is too conclusory because it does not specify which statutes, rules, or regulations had been violated or how appellants had violated any statutes or rules. They argue that the TI "simply sets out in general terms the elements necessary for injunctive relief in a statutory violation case," as in *Independent Capital Management, L.L.C. v. Collins*, 261 S.W.3d 792, 795-96 (Tex. App.—Dallas 2008, no pet.), as opposed to those found to be sufficient in *West*, 212 S.W.3d at 521-22, and *San Miguel*, 40 S.W.3d at 108.

In *Collins*, the injunction merely recited the elements that entitle a party to injunctive relief:

> (a) Plaintiffs are entitled to injunctive relief from this Court as a result of the actions committed by Defendants ICAP and ASSOCIATES, (b) Plaintiffs have a probable right to recover in this action, (c) Plaintiffs are suffering and will continue to suffer immediate and irreparable harm as a proximate result of the conduct of the Defendants ICAP and ASSOCIATES, (d) Plaintiffs have not [sic] adequate remedy at law, (e) action by the Court is necessary to preserve the status quo, and (f) Plaintiff's Motion request [sic] that a Temporary Injunction be issued, should be GRANTED.

261 S.W.3d at 795-96. The modified TI, although it does not specify specific statutes that were being violated, specifies that an injunction was necessary to enjoin appellants' violations of the water code, health and safety code, natural resources code, and applicable rules, also stating that environmental contamination existed at appellants' facility and required remediation. It thus is more akin to the injunction in *West*, which found that the defendants would dissipate funds obtained through misrepresentations that violated the Deceptive Trade Practices Act, 212 S.W.3d at 521-22, or *San Miguel*, which found that the defendants had violated the city's zoning code, thus "constitut[ing] the injury necessary to the granting of a temporary injunction," 40 S.W.3d at

12

108. The TI thus states with sufficient specificity that appellants' facility was in violation of state law. We overrule appellants' third issue and the related portion of their first issue.

Finally, appellants argue in their first issue that the evidence does not establish a violation or threatened violation of statute because by the time the modified TI was signed, they had already capped the pipe that had been discharging directly into Skull Creek, and the State did not present evidence showing other statutory violations. Appellants assert that the State's witnesses, when asked "about other alleged discharges" at the facility, testified that they had not taken samples or conducted testing to determine what the alleged discharges consisted of and only testified that various containers at the site were leaking or standing open. To address this argument, we will first summarize the evidence presented to the trial court.

In the May 2019 hearing, which resulted in the agreed TI, the trial court heard testimony by Trey Thumann, a TCEQ environmental investigator, who described the site and its condition between February and May 2019. The facility includes "two super sack pad areas"[6] (one of which—Super Sack Pad Area 2—is adjacent to Skull Creek on the southern end of the facility), "two wash racks" and a "mixing pit,"[7] a chemical-storage area, a recycling area, a

---

[6] A "super sack" is "a large white bag that different materials are stored in." The bags are durable fabric, open at the top, and "very large."

[7] Wash racks are areas where appellants "wash off truck tires, trailer tires, and then they wash out plastic totes and other types of containers," including from the chemical storage area. Wastewater from the process collects into a wash rack, which has a concrete containment wall on three sides, and is then transferred into tanks. Some wastewater is used to make road base, and some was discharged through a pipe "directly into Skull Creek." The "sludgy material" that remains in the wash racks, along with other materials "from tanks they've emptied," is put into the mixing pit, which is "an open-air containment basin" with earthen berms but no impervious or concrete liner. Appellants try "to solidify the material in there, basically by turning it upside down—or turning it over to dry it out."

storage-tank area, and "several piles of road base material."[8] On February 12, Thumann did not observe any contamination or odor upstream from the facility, but downstream he saw "[a] black coloration to the water and kind of a hydrocarbon-y, sewage-y smell," testifying that the water's usefulness had been impaired because "the water is black, it smells, and the fish in it have died." He said the pollution was caused by the facility's discharge pipe and Super Sack Pad Area 2, where material was "oozing from the ground" and the same material was found in Skull Creek.

Thumann believed the super sacks contained a combination of "[f]rac sand and WG-39," explaining that Polston had informed him that the sacks contained WG-39. Polston also gave Thumann a safety data sheet for WG-39 and told him that WG-39 "was food-grade carbohydrate." The super sacks were stored on the ground without liners or other impervious material under them, most were deteriorating, and "[a] majority of" the contents "were spilling out onto the ground" and exposed to precipitation and runoff. By mid-April, the super sacks were gone, and Thumann saw a bulldozer with "remnants of the sack" on its blade and tracks and "material that was contained inside the sacks" on the bulldozer and on the ground next to it. He believed the super sacks had been "pushed into the ground" in an area adjacent to a pond.

In the chemical-storage area, Thumann observed numerous containers sitting on the ground with no liner or other barrier materials under them—some had "lids off of them" and some lacked lids altogether. Thumann observed spills, leakage, contents "spread across the ground," and "weathered and deteriorating" containers. He did not see apparent precautions against spills or apparent efforts to clean up spills or prevent them from leaching into the ground. The area included a berm to prevent storm water from washing spills into a nearby pond, but

---

[8] Road base is "the base material that's applied in a road construction project" as a "base for the actual road construction project." It is a granular material with "a hydrocarbon-y smell to it" made on site by mixing different materials with Portland cement.

14

there were still areas "where it flowed into the pond." Thumann conceded that he had not asked what was under the containers, sampled all of the containers, or dug down to see if there was a barrier under the tote or whether the spilled materials had soaked into the ground. Thumann also observed road base "stockpiled on the site," including near Skull Creek, and used for berms and roads around the facility. Some of the piles, which were on the ground with nothing underneath them, were thirty to forty feet tall and thirty yards wide, and Thumann saw liquid hydrocarbon leach out during rain events. One wash-rack wall was cracked with "discharge points," and at another, liquid had "escaped the primary containment area," requiring appellants to build a dirt berm to stop discharges. Between February and May, appellants enlarged the mixing pit, making it "[p]robably 20 foot longer," and Thumann saw liquids in the pit and testified that if it rained heavily, the pit would reach capacity and overflow into surrounding areas. While the April 2019 TROs were in effect, Thumann saw appellants accept materials from tanker trucks, despite being ordered not to do so, and said appellants had not placed all waste in covered, non-leaking containers or prevented discharges of wastes "and materials of concern." Thumann also saw the same leaking containers over several visits with no change in their condition.

Bills of lading from March and April 2019 were introduced into evidence and show that appellants accepted waste such as: "spent caustic solution," "waste corrosive liquid, flammable," and "N.O.S. (sodium hydroxide)"; "Flammable Liquids N.O.S.," "trimethylbenzene," and "dimethylminoethanol"; "caustic water, NOS (sodium hydroxide)"; "Hydrocarbon Liquid, N.O.S. (Slop Oil)"; and "Flammable liquids" containing toluene solution, methyl alcohol, methanol, and chlorobenzene. Photographs were also introduced into evidence, and some depict leaking, open, or spilled containers; an area in which an unidentified material was "oozing onto the ground from its packaging"; the bulldozed Super Sack Pad Area 2 showing

15

sack remnants and "black gel-like material that was observed oozing from the ground"; and the same or "very similar" material on the banks and in the black water of Skull Creek.

The trial court heard testimony about testing conducted on soil and water samples taken from the area in February and March. Upstream of the facility, the tests did not detect volatile organic compounds (VOCs) or semi-volatile organic compounds above quantifiable limits. A sample from the facility's discharge pipe had elevated levels of total petroleum hydrocarbons (TPH) and chemical oxygen demand (COD),[9] and downstream, the samples contained COD and manganese[10] higher than levels deemed safe, as well as heightened levels of TPH, chromium, copper, lead, zinc, and VOCs toluene, zylene, "ethylbenzene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene," all of which are potentially toxic.

In the December 2019 hearing on the State's motion for contempt,[11] Jason Ybarra, a Waste Section Program and Emergency Response Manager with TCEQ, testified that he had visited the site about seventeen times since the agreed TI was signed in May 2019, including the week before the December 2019 hearing. Based on his observations, he did not think appellants had complied or even attempted to comply with the trial court's orders. Ybarra testified about photographs taken during his visits and introduced into evidence, describing photos taken in June as showing totes with leaking chemicals or "some type of oil or gas

---

[9] Thumann explained that "[t]he higher the COD level, the less available oxygen in the water for aquatic life" and testified that the discharge-pipe sample had "the highest COD level we have ever seen."

[10] Manganese can harm livestock that drink the water, and livestock tracks were found at the site.

[11] In addition to the witnesses called by the State and appellants, Polston also took the stand but, in response to every question he was asked, declined to answer under the Fifth Amendment on the grounds that it might tend to incriminate him.

16

material" onto the ground; totes that were stacked with chemicals leaking from the top and corroding containers on the bottom; "[a] lot of totes that were uncovered" with an "oily mixture" leaking and overflowing and staining the ground"; "some type of chemical that was cracked on the tote and was leaking on the ground and kind of pooling and then drying"; livestock tracks in the chemical stains; and containers that had been double stacked but had fallen when the plastic deteriorated and cracked, leaking their contents onto the ground. Ybarra explained that some of the photographs showed the same broken and leaking containers over a period of months, with no change in how they were being handled.

Asked about the agreed TI's provision requiring appellants to stop discharging waste and about the chemical-storage area at the site, Ybarra testified that "there's a lot of totes that are unlabeled, drums that are unlabeled, small containers, and during the site visits, you would see discharges from a lot of the totes, containers, and drums that deteriorated and have broken. And you will see a lot of the soil saturated as well." In addition, Ybarra saw "a lot of drums" in the chemical-storage area that "were bulging at the seams and creating kind of domes over the drum, where the volatile materials were in there were basically expanding the drum, and kind of on the hot days that we were there, you can hear them pop and move." He testified that there is a "real strong volatile odor in most of the [chemical-storage] area," explaining that "volatile" meant "kind of the benzene, toluylene, a lot of flammable liquid smells," and that he also noted "hydrocarbon odor" or "real pungent kind of acidic smells." Ybarra said that in every one of his seventeen visits, he had seen discharges at the chemical-storage area.

Ybarra was asked about Super Sack Pad Area 2, from which appellants were supposed to have removed "waste, including super sack material and WG-39," by May 21, 2019. He described WG-39 as "kind of a black liquid that's syrupy and oozy, and, you know, it's

17

pooled" in the area. Ybarra testified that appellants had scooped material out of "Priority Area A" but had then dumped it on top of "Priority Area B," merely moving the waste around. He said appellants "did not dispose of anything" and testified that his impression of appellants' efforts to remove waste from Priority Area B was that "[it] was a complete failure."

Ybarra testified similarly about the mixing pit, saying that in late June, he did not see any efforts to remove liquids from the pit: "the pits [were] still full" and were at "about the same level." He was also asked about the road base and contaminated sediment in Skull Creek and said that in September 2019, there were still chunks of road base on the creek's banks and that he had not seen appellants attempting to remove road base or contaminated sediment from the creek. Ybarra had never seen a licensed professional engineer or geoscientist investigating the site,[12] nor had appellants submitted a report from such an investigation. He testified similarly about appellants' failure to address other requirements of the agreed TI, such as characterizing waste on the site[13] or removing waste from open basins. Although appellants had shown the trial court before and after pictures showing dry containment areas, Ybarra testified that the week before the hearing, the depicted tank "was at least half full of contaminated water."

Throughout his testimony, Ybarra was asked to describe steps appellants could take to address the requirements of the agreed TI. He said, for example, that they should have inspected the containers, removed any that were not structurally sound, and cleaned up spills on the ground or that they could have used their operable pumping equipment to remove

---

[12] The agreed TI required appellants to have a licensed engineer or geoscientist prepare a report of the site and the extent of waste contamination within sixty days.

[13] "[W]hen you have an undetermined waste, you would do a hazardous waste characterization," "looking for ignitability, reactivity, toxicity, and grosivity, and seeing if it's a characteristic for hazardous waste," and then disposing of the waste at appropriate facilities.

contaminated water from open basins and transported it to a facility authorized to dispose of it. Ybarra said that appellants had taken few steps to address the trial court's requirements and that he would characterize appellants' efforts to comply with the agreed TI as "[i]nadequate" or even "[a] complete failure." He thought appellants could comply with the agreed TI but instead were in willful violation of it.

Ybarra was aware that the Railroad Commission was on site but did not know when it started to have a presence at the facility. He said he had learned from Commission personnel that "they've seen people take road base" from the site. As for appellants' efforts to comply with the agreed TI, Ybarra had seen some workers "kind of excavating and moving" material from Super Sack Area 2, dumping "on Priority Area B, but it wasn't a lot of workers." Ybarra did not know how much it would cost to hire sufficient workers or to dispose of the amount of waste at the facility. Appellants had "made some calls and talked with some people" about getting the waste characterized so it could be moved. Further, Ybarra had seen workers "sucking out oils from the ponded area where when it rains everything overflows and it discharged all into the ponds. And they were trying to recover the oil from it." However, it was "[k]ind of after the fact" because appellants "never pumped out the basins, and then it rained and then it overflowed, so it impacted more of the property." Ybarra saw efforts to plug leaks in the mixing pit and said that appellants had eventually drained the liquid and covered the pit to minimize contact with rainwater. He had also seen workers "rifling through the WG-39 deteriorated bags, kind of segregating super sacks, segregating the broken pallet wood, and then segregating the WG-39 and some—and some soils and some road base," "making big waste piles of it." He agreed that appellants were "segregating different waste streams" but noted that there is "environmental harm that is going along with it as well." A fact sheet about WG-39 states that

19

it is nonhazardous, but Ybarra said, "We don't know if it was—you know, had any other toxics mixed with it," although he conceded that he did not know that any other substances were mixed into the WG-39 in the super-sack areas. Ybarra testified that the WG-39 had leaked into state waters, where its effect on aquatic life would be to "starve them from oxygen and kill them." Ybarra said that although appellants had made some efforts to clean up the super-sack area, there are "no controls in place for discharges," whether from WG-39's powder form, its "clumped up form," or its "black, oozy liquid" form.

Ybarra had seen a report stating that appellants had emptied one leaking tote and transferred the waste into a nonleaking container, and he knew of a June report indicating that at least twenty drums were listed on a bill of lading as being removed from the facility, but he also said that "we don't know the final disposition" or whether the material was sent to a proper facility for disposal or recycling. Ybarra guessed that appellants had removed about fifteen containers from the chemical-storage area since the agreed TI was signed but thought "a couple thousand" containers remained. Ybarra said that appellants had immediately installed the required cap on the discharge pipe and that he had seen appellants attempting to construct berms to separate the creek from a lake.

Philip Bullock, an environmental geoscientist hired by LCRA to inspect and investigate the site, testified that before the agreed TI was signed, appellants were discharging waste directly into Skull Creek from the discharge pipe and also through road-base materials that had been used to build dams or roads throughout the site. He had been to the site three times, including after the agreed TI was signed, and had collected water and sediment samples upstream of the facility's discharge point, at the discharge pipe, and downstream in Skull Creek and the 50-Acre Lake. Bullock testified that upstream, "all indications," including visual

20

observations, "appeared normal and clean. There was no evidence of contamination." At the discharge point, however, "the conditions were very clearly different. There were odors. There was black staining. So it was quite apparent that the discharge and the area downstream of the discharge pipe was the source of contamination that was observed." He said the "odors were very strong, and the water coming out of there—the liquid coming out of there was dark. And so it was an obvious source." Testing from the discharge pipe and the area near the pipe showed the same contaminants, and Bullock explained that the samples contained "benzene, total BTEX, total TPH, and total PHAs detected at very high levels, as well as the pH detected at a very high level." Bullock testified that the test results were consistent with his field observations. Bullock also testified that his team had conducted testing on the road-base material and found "very high levels of the same types of chemicals we were seeing in the sediment." He said the road base "breaks up and . . . falls apart under pressure. When you break it open, there were hydrocarbon odors very apparent."

As for the super-sack areas, Bullock said in August 2019, he smelled "strong hydrocarbon odors" and observed:

> bags of materials and pallets that they were on were all being pushed into a local pond or, you know, water body that was right there. . . . They were being buried into this pond. When you walked around on the surface, it was spongy where the materials were. You would see black hydrocarbon-rich material oozing out, seeping out from different areas.

Bullock was asked about appellants' insistence that WG-39 is "just carbohydrate," and he said he had taken a sample from the super-sack area but that "it was just a mess" and he "couldn't distinguish whether or not what we were sampling was super sack material or stuff that had been mixed with it." The tests from that area showed "very high levels of petroleum hydrocarbons."

Bullock agreed that appellants had attempted to build some berms but said he had not seen any indication that appellants consulted with a professional engineer or geoscientist in designing the berms, as required by the agreed TI. Further, appellants had used "very sandy, noncohesive material" that was insufficient to withstand flood conditions—the materials used are "very permeable," "very subject to erosion," and may be damaged by or washed out in flooding, "basically becom[ing] ineffective." Bullock testified that the "berms were considered critical" because they are intended to isolate the 50-Acre Lake, which "is full of contaminated sediments that have been washed in from the road base materials that have been used out there as well as the discharges," from Skull Creek, allowing appellants to "focus their resources on cleaning up" the creek. The berms are "not an expensive part [of the agreed TI], but it was considered to be very important to being able to protect downstream property owners and the Colorado River."

Bullock also testified that appellants had "failed to remove the sediments from the creek and the road base," and he did not think appellants' inventory of the chemical-storage area was sufficiently specific, noting for example that one of the listings is "oil and water" and stating that "oil" "is a broad term, and I wouldn't know what particular chemicals are in that oil." He explained that it is important to know exactly what materials are in the various totes because "[y]ou don't want to store chemicals that are incompatible with each other in the same areas." Bullock said appellants had not complied with various terms of the agreed TI.

Peter Pope, Site Remediation Section manager for the Railroad Commission, testified that none of appellants held a current Railroad Commission permit. He said that appellants had a permit with a 2007 expiration date, which had been renewed until March 2017, when the Commission received a letter from appellants indicating bankruptcy and stating that they were no longer pursuing renewal. The Commission then informed appellants that the

22

facility could not accept any further waste and "must begin closure activities." Under the permit, appellants were limited to 4,000 cubic yards of treated waste and 7,750 cubic yards of untreated waste, and Pope testified that in the Commission's estimate, more than "200,000 cubic yards of untreated waste" was "piled on site." He described it as about "a football field length. And in the highest point, stacked up between 20 and 30 feet."

Pope also testified that appellants had provided the required financial assurance by way of a $5,575,000 bond from a surety. The bond had been forfeited, which means the money "goes into the Oil and Gas Regulation Cleanup Fund" to be used by the Commission "to plug abandoned wells[,] clean up abandoned oil field sites," and conduct environmental investigations. Pope said that certain conditions must be met before cleanup-fund money can be used—generally, the "site should be abandoned," although the Commission can spend funds if there is an emergency situation and the Commission cannot "get the operator to respond timely"; the waste must be of a kind that is within the Commission's jurisdiction, which is generally "waste generated from drilling a well" or "generated along the transport of oil and gas to a refinery"; and the Commission has to prioritize sites based on its annual budget and a list of sites needing to be addressed. Pope testified that the super sacks at the site do not fall within Commission jurisdiction; that the waste held in the frac tanks and mixing pit might, depending on what is in them and where the waste came from; and that he believed there had been "commingling of TCEQ and Railroad jurisdiction waste" at the facility. The Commission had not taken over the facility, although it was in the process of "initiat[ing] an enforcement action," which can result in the Commission paying for clean up if the operator does not do it itself. Pope testified that it is the operator's responsibility to clean up the site and that if the Commission spends money to do so, whether from the cleanup fund or another source, it will probably seek

23

recovery of those funds from appellants. Based on what he had seen, the bond amount will not cover the "Railroad jurisdiction waste cleanup." Instead, he was "aware of an estimate of close to $80 million" "just to remediate the areas of concern under the Railroad Commission's jurisdiction," although he agreed that a consulting company hired by the Commission had developed "remedial alternatives," one of which included groundwater monitoring for thirty years that would cost closer to $750,000. Pope agreed that appellants' proposed modifications to the injunction would require the Commission to "do things it's not authorized to do."

Tim O'Neil, an engineer employed by ESE Partners and called by appellants, testified that ESE was an "environmental consultant" and that ESE personnel "go out and do site inspections, on average, twice a week to evaluate general conditions, various locations across the site, and we have done also some limited amount of sampling and testing." O'Neil had been to the site six to eight times and had worked on appellants' weekly reports to the State. He thought the Railroad Commission had taken control of the site and had not seen appellants conducting ongoing operations on the site but had seen a few people conducting "remedial activities."

O'Neil took water samples in August 2019 at the discharge point and downstream in Skull Creek and testified that the water did not contain any VOCs "above detection limits or above any applicable regulatory limit." A "couple of samples" had "lead and mercury, slightly above a regulatory limit," but when those samples were analyzed for the contaminants' "ability to leach from a solid into a liquid," they were "demonstrated to be below regulatory limits." The samples had similar TPH results—the levels in the "total analysis that was in the sediment" exceeded regulatory limits, but when run under the leaching analysis, were "generally at or below the regulatory limits." On cross-examination, however, O'Neil conceded that one sample had a mercury level above "a protective concentration level for a surface water quality standard."

24

O'Neil testified about various reports submitted by appellants, stating, for example, that in May 2019, appellants reported that they "had repair and enhancement of the earthen berm separating the pond east of the Super Sack Number 2 Area and isolating that from Skull Creek." O'Neil testified that he had inspected the berms and found them "intact and functioning as intended." On cross-examination, however, O'Neil testified that he did not certify the berms' construction and that he could not testify that the soils used met the agreed TI's requirements. O'Neil also described appellants' excavation efforts in the super-sack areas and said it "basically entailed the excavating of material that was described to me and was—appeared to be consistent with WG-39 material that was mixed with likely road base or other materials that had been deposited on the property." Appellants "physically excavat[ed]" 112 loads, "removing that stuff from the areas that it had been deposited in and bringing it to the surface and stockpiling," and built a berm around the stockpile of excavated material in June 2019 to stop any runoff from migrating into Skull Creek.

In addition, O'Neil said, appellants had started to remove containers from the property, transporting them to other facilities, and he frequently saw workers trying to pump liquids from processing areas or other basins and storing them in frac tanks, an effort with a "fairly high cost" because of equipment costs and rental rates for the tanks and because it must be done again every time it rains. Reports from September stated that appellants had "completed removing the free liquids and fluids from the mixing pit . . . and made significant progress in removing all the free liquids from other areas of secondary containment in the processing area." Appellants had also "completed inspections, identified leaking totes, and moved contents to nonleaking containers"; "completed excavation and stockpiling of all road base mix, soil-containing elements of degraded WG-39 from Super Sack Area No. 2"; and "completed

25

placement of a protective tarp or plastic over the mixing pit to prevent contact from precipitation." He said that in his observation, "almost every single week, there was some bit of progress that could be specifically identified and noted." He did not believe that it would have been possible for appellants to meet the agreed TI's deadlines because of the quantity of materials and appellants' resources. O'Neil believed appellants had been making a good-faith effort to comply with the agreed TI and did not see evidence of intentional failures to comply.

William Wilder, president and sole employee of Axis Environmental Services, testified that he had been hired by appellants to "look at the overall picture of what this site presented in terms of hazards, what type of remediation options there were, and general just soup-to-nuts approach to what is going on at the facility." He had been to the facility between seven and ten times, first in May 2019. He testified that he had not seen any ongoing business operations at the site and that he had reviewed and verified ESE's weekly reports. Wilder thought that appellants were "actively trying to address the remedial concerns" in the agreed TI but that given "the amount of materials that is currently contained out there," it would have been impossible to meet the agreed TI's deadlines to characterize, remove, and dispose of the materials. He also testified that appellants had had difficulty finding other facilities that would work with them to dispose of materials moved from appellants' site.

Wilder had observed some of appellants' efforts to excavate the WG-39 and said that they had several pieces of construction equipment on site and were working "very carefully" to move the materials "back towards the pad that had been built" and then move it into a stockpile behind a berm. He asserted that in his observations, the temporary berm was functioning as intended—there was some light erosion due to rain or runoff but the berms were later repacked, and he never saw it erode more than eighteen inches from the surface.

26

Furthermore, the vegetation in the 50-Acre Lake area was not showing adverse impacts and was growing well, and Wilder saw fish and turtles in the water, along with animal tracks in the area, concluding that "it's everything you would expect to find in a wetland in this part of Texas." Wilder did not believe that the hydrocarbons present in the road base were leaching out into precipitation. He was asked about why some tests showed TPH when the road base was tested, and he explained that if a sample has "the particulate road base in it," the "extraction procedure required for total analysis" will "create a mechanism to release that material." However, "[t]hat mechanism does not exist in nature," and Wilder believed that the State's test results were largely due to road-base materials being "entrained" into the collected samples, leading to findings of "chemicals of concern." He did not believe that the road base, left as it is, was "contributing to the water problem" and "disagree[d] that the road base presents a contaminant." He also thought that the early alarming test results from the discharge pipe was "possibly a singularity" and noted that all discharge has since been stopped.

Bart Huffman, vice president of Huffman Hydrocarbon Engineering, testified that he was hired by appellants as a consulting engineer and that he had assisted appellants' predecessor with getting the initial recycling permit, which was later transferred to appellants. Huffman said that appellants had held two separate permits—a "hundred-acre landfarm application treatment and then there was the recycling"—but that the two permits were later combined into a single permit. The permit or permits were first held by Inland Environmental, then transferred to Boundary Ventures, and later transferred to Inland Recycling. Appellants were authorized to "bring in Railroad Commission regulated solid waste" and then recycle the materials and put them through "quality assurance, quality control testing is performed, compressive strength, stability, and also leaching of volatile organics and heavy metals, as well

27

as pH and leaching of TPH." If the road base passed the tests, it can be sold, and according to Huffman, if road base that satisfied the criteria was placed on the property with the Commission's knowledge, that was "essentially like putting the same road base out on the roads, the same road base the counties use." Huffman "assume[d]" the Commission knew that road-base material was being provided to the owner of the land on which the facility is located and said any road base used on the facility's roads "belonged to" the landowner.

Although there was evidence to the contrary, the court heard testimony that between May and December 2019, several witnesses saw waste left in conditions that allowed it to be swept up in rain events and deposited into state waters and smelled strong hydrocarbon and "volatile" odors throughout the site. Waste continued to be stored in open, leaking, degraded, or tipped-over containers; spills were left on the ground from visit to visit; wastewater remained at least periodically in the mixing pit and wash racks, where it would overflow with rain; and road base remained on the banks of the creek and throughout the facility.

Persons are prohibited from allowing any discharge that causes "pollution of any of the water in the state," *see* Tex. Water Code § 26.121(a)(3), *see id*. § 26.121(d) (person may not discharge "any pollutant" or "industrial waste" into any water in state), *see also id*. § 26.001(14) ("'Pollution' means the alteration of the physical, thermal, chemical, or biological quality of, or the contamination of, any water in the state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property or to public health, safety, or welfare, or impairs the usefulness or the public enjoyment of the water for any lawful or reasonable purpose."), and the State presented evidence that appellants' facility had numerous conditions—the stockpiled or buried WG-39 and frac sand, the mixing pit and wash racks, and stockpiled road base, not to mention the leaking containers in the chemical-storage area—that

28

already had caused, or at a minimum were likely to cause, such pollution. Given the breadth of the State's concerns, the evidence about the facility's condition, and appellants' alleged failures to comply with environmental statutes and rules—as well as the trial court's earlier TROs and the agreed TI, we hold that sufficient evidence supported the trial court's determination that appellants had violated or threatened to violate state environmental laws such that a temporary injunction was necessary. *See Shorts*, 549 S.W.3d at 878. We overrule appellants' first issue.

*Should the TI be Modified?*

In their fourth issue, appellants argue that the TI should be modified to eliminate provisions "that go far beyond maintaining the status quo." They first argue that the State did not show that the TI is justified by extreme necessity or hardship and, therefore, that the mandatory nature of the TI is improper. They further argue that the TI should be "limited to prohibitory restrictions" that are "narrowly tailored to the alleged statutory violations."

Injunctive relief can be prohibitive, forbidding conduct, or mandatory, requiring conduct. *See LeFaucheur v. Williams*, 807 S.W.2d 20, 22 (Tex. App.—Austin 1991, no writ). "Generally, the preservation of the status quo can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury on complainant." *Rhodia, Inc. v. Harris County*, 470 S.W.2d 415, 419 (Tex. App.—Houston [1st Dist.] 1971, no writ). "Although ordinarily a mandatory injunction will not be granted before final hearing, a trial court has the power to grant a mandatory injunction at a hearing for a temporary injunction where the circumstances justify it." *Id*. Here, as in *Rhodia*, "[t]he status quo was an unpolluted [creek]," and the pollution of Skull Creek is a demonstrated irreparable injury. *Id*. at 420. Further, the

29

water code explicitly allows a trial court to issue a "prohibitory or mandatory injunction" if warranted by the facts. Tex. Water Code § 7.032(d).

Appellants complain that they were required to contact their known suppliers and ask that the stored waste be removed; provide weekly updates of those activities, as well as other efforts to comply with the TI; promptly respond to any written information requests; and hire an engineer or geoscientist to conduct a preliminary site investigation, inventory and map waste at the site, identify and test containers in the chemical-storage area for hazardous waste, ensure that containers are properly maintained, contain the WG-39, contain road base and other materials from Skull Creek, construct sufficient berms to separate the creek from 50-Acre Lake, and conduct a final site investigation. Although appellants assert that those requirements do not preserve the status quo, we cannot overlook the fact that appellants failed to comply with abatement and remediation requirements placed on them by the trial court in its earlier orders or similar requirements agreed to in the agreed TI and conclude that the court did not abuse its discretion in determining that the actions required of appellants by the TI were necessary to restore the creek to its unpolluted state, thus preserving the status quo, and to avoid further irreparable harm in the form of repeated pollution.

As for appellants' argument that the TI goes further than equity requires, the trial court heard evidence that appellants continued to accept waste at the site after being ordered not to, that they buried WG-39 adjacent to the creek rather than remove it, that they built berms out of sand rather than materials that could withstand rain events, that they were understaffed in their remediation efforts, and that they allowed degraded and leaking containers to sit in the chemical-storage area for long periods of time without addressing the leakage. Appellants entered into the agreed TI but then did not comply, instead seeking modifications of the agreed TI that would

30

transfer appellants' responsibilities to the Commission and asking that the Commission be ordered to take actions it was not authorized to take. Appellants referred at the hearings to the costs associated with the cleanup and indicated that they lack resources to conduct the required activities. However, in conducting their business, appellants allowed waste to accumulate at the facility to such an extent that Skull Creek ran black. On this record, they have not shown that equity requires that they not be ordered to clean up the environmental mess that they created. We overrule appellants' fourth issue.

### *Does the Modified TI Adjudicate the Parties' Core Dispute?*

In their second issue, appellants argue that the trial court erred in issuing the TI because it had the effect of adjudicating the parties' core dispute without a trial on the merits. In their fifth issue, they argue that the TI improperly requires appellants to take affirmative steps and alter the status quo with no showing of extreme necessity or hardship to justify such a requirement. We disagree.

In its petition, the State sought a permanent injunction along with civil penalties against appellants, including Polston personally, under the water code and the natural resources code, and attorney's fees and costs. The State asked that the permanent injunction bar appellants from accepting, storing, or processing any waste at the facility; disposing of any waste, including by burying it or placing it in bermed areas or basins; discharging any waste at the facility or into state waters. In addition, the State asked that appellants be ordered to:

- designate a professional engineer or geoscientist as a project manager responsible for implementing the requirements of the permanent injunction

- immediately start to remove and dispose of all waste, including road base, on the ground near Skull Creek or any bodies of water connected with the creek; start to remove and dispose of any aboveground storage containers; remove and dispose of all waste at the

31

facility within 180 days; document all removal, transportation, disposal, and sale of waste and submit that documentation to TCEQ and the Commission

- submit monthly reports "detailing all actions taken to comply with" the injunction

- "dewater any accumulated liquids" and prevent runoff

- ensure that any excavations be conducted "as necessary to achieve original grade" and then revegetated as appropriate

- immediately commence a soil and subsurface investigation to determine where groundwater borings, stratigraphic borings, and monitoring wells should be installed; install groundwater monitoring wells; and test samples from those wells, submitting monthly reports of those test results

- immediately start an Affected Property Assessment (APA) that addresses water, soil, and groundwater at the facility and includes "assessment of the vertical and horizontal extent of contamination to all Affected Property, including off-site property"

- prepare an Affected Property Assessment Report (APAR) that satisfies TCEQ's rules governing such reports, *see* 30 Tex. Admin. Code §§ 350.1-.135 (Tex. Comm'n on Env't Quality, Texas Risk Reduction Program), and includes groundwater-monitoring results and an assessment of all actions necessary to clean and control any remaining groundwater contamination to the satisfaction of TCEQ and the Commission

- upon TCEQ and Commission approval of the APAR, submit a plan "to address closure, post-closure care and remediation of water, soil, and groundwater located at the Facility and associated off-site impacts"; "remediate all environmental media on all Affected Property containing chemicals of concern in excess of critical Protective Concentration Levels"; submit a "Response Action Completion Report," *see id*. § 350.95 (Tex. Comm'n on Env't Quality, Response Action Completion Report); submit a closure plan in accordance with TCEQ rules detailing the removal and appropriate disposal of all wastes and closure of each of the facility's components; and submit a Final Remedial Completion Report describing all cleanup activities and documenting the disposition of all oil and gas waste removed from the site, soil and groundwater sampling tests that show appellants had met their "cleanup objectives," and institutional controls (meaning a legal document placed in the property records notifying the public of usage limitations placed on the property to protect human health and the environment)

- continue groundwater monitoring sampling and analysis every six months for three years after the facility's Final Remedial Completion Report is submitted.

The TI, on the other hand, orders appellants to stop accepting waste; to stop storing or processing waste in a manner that causes any discharge into state waters; to stop

32

disposing of waste at the site; to stop discharging waste at the site or into state waters; to contact all known suppliers and ask them to remove their waste to an appropriate facility; to abate and contain spills and discharges; to hire an engineer or geoscientist to conduct a "preliminary site investigation, documented in an [APAR]," as to (1) the bed and banks of Skull Creek beginning at the discharge pipe and extending along appellants' property line and (2) Super Sack Area 2 and adjacent areas; hire a professional engineer or geoscientist to construct cohesive, compacted berms to isolate 50-Acre Lake from Skull Creek, conduct a final site investigation, documented in an APAR; submit a detailed inventory and map of all waste at the site; test and determine whether any of the containers at the chemical-storage area contain hazardous waste; ensure that all containers in that area are properly maintained; remove all WG-39 from Super Sack Area 2 and the areas adjacent to Skull Creek, including residues or mixtures, and contain it in covered, non-leaking containers or impermeable basins; similarly remove and contain "any contaminated sediment, roadbase, Waste, substances, products, and materials located within" twenty-five feet of Skull Creek's bed and banks; and submit weekly reports of their progress.

When the status quo is compliance with environmental laws and the State presents sufficient evidence to support a finding of a likely violation or threatened violation of those laws, a trial court must be able to issue an injunction that requires the defending party to take measures to stop polluting and abate water pollution that has already occurred. *See Texas Pet Foods, Inc. v. State*, 529 S.W.2d 820, 829-30 (Tex. App.—Waco 1975, writ ref'd n.r.e.). As this Court has held, "The status quo was an unpolluted river; not a contaminated stream caused by the wrongful acts of appellants." *Magnolia Petroleum Co. v. State*, 218 S.W.2d 855, 860 (Tex. App.—Austin 1949, writ ref'd n.r.e.); *see also Rhodia*, 470 S.W.2d at 420 ("The appellees have shown that irreparable injury is occurring and that a statute is being violated, and they are entitled to a

33

temporary mandatory injunction which will require Rhodia to prevent excessive quantities of arsenic from polluting the public water in the manner in which the appellees have shown Rhodia has done so.").

The record indicates that a full measure of the kinds of waste at the facility is not known; that unknown waste is stored in open or leaking containers; that the degree to which soil and groundwater has been contaminated is as yet unknown; that road base and WG-39 remain in contact with state waters or in conditions that make such contact likely; and that water quality downstream of the facility has suffered, although appellants did address at least some of that concern by capping their discharge pipe. The TI requires appellants to take actions, including conducting studies and constructing berms under the eye of a licensed professional, to determine the full extent of the waste and contamination and to protect Skull Creek from further pollution, which would re-establish the status quo of an unpolluted creek and surrounding areas. *See Magnolia*, 218 S.W.2d at 860 ("The status quo was an unpolluted river; not a contaminated stream caused by the wrongful acts of appellants."). And, as noted by the State, the actions it seeks in its request for a permanent injunction, which has a forward-looking perspective and seeks to remove all waste and remediate the site, go well beyond those imposed by the TI, which seeks to identify, abate, and isolate pollution and contamination that has already occurred at the site so that further appropriate remediation plans can be developed.

We thus overrule appellants' sixth issue, which insists that the modified TI improperly requires them to "take affirmating steps to alter the status quo," and their second issue, which argues that the modified TI impermissibly grants substantially all of the relief

sought by the State.[14] *See West*, 212 S.W.3d at 518-19 ("when it is determined that [a] statute is being violated, it is within the province of the district court to restrain it" (quoting *Texas Pet Foods*, 591 S.W.2d at 805)); *Magnolia Petroleum Co.*, 218 S.W.2d at 860 ("courts are not required to bide their time and wait until the parties see fit to discontinue their unlawful acts").

*Is the TI Overbroad?*

In their sixth and final issue, appellants argue that the TI should be reversed or at least modified because it is overbroad. They argue first that the trial court abused its discretion in enjoining Boundary Ventures because the State did not request injunctive relief against that entity. They secondly insist that the TI is overbroad in its definitions of "waste" and the "Site."

After the agreed TI was signed, the State filed an amended petition adding Boundary Ventures as a defendant and seeking permanent injunctive relief against all the defendants collectively, along with all other relief to which the State is entitled. About a month later, the three appellants other than Boundary Ventures filed their motion to modify the agreed TI, asking in part that the Commission be ordered to use Boundary's surety money to work on

---

[14] This case differs from *Clint Independent School District v. Marquez*, 487 S.W.3d 538 (Tex. 2016). In that case, a group of parents sued, asserting that the way the district distributed money, a system it had used for years, was illegal. *Id*. at 543, 557. The parents conceded that the legality of the system was the lawsuit's central question, and the supreme court held that the parents could not "obtain a temporary injunction forcing the district to change its distribution methodology before a trial on the merits." *Id*. at 557. Here, the State sued soon after an acute pollution event, seeking to stop appellants from discharging waste into state waters and to require them to make changes at the facility to ensure the pollution did not happen again. The central question here is not whether the kind of discharge alleged by the State is a violation of environmental law, nor is there some kind of longstanding status quo under which such discharges were allowed before being challenged. Appellants may contest whether it was they who caused the downstream issues or whether their storage of WG-39, road base, or the unidentified chemicals violates the state's environmental laws, but given the evidence of the condition of the facility and the adverse effects downstream, a TI requiring appellants to stop discharges into or near Skull Creek and to take steps and gather information to address concerns raised by TCEQ and the Commission is not equivalent to the injunction sought in *Marquez*.

the site. The State submitted a proposed modified TI that included Boundary as an enjoined defendant, and in the January 2020 hearing, after the State discussed Boundary Ventures' Commission permit and associated bond and the parties discussed whether and how those funds could be used at the site, the trial court stated that it was signing the State's order. At no point in the hearing or in any later filings did Boundary Ventures argue to the trial court that it could not be enjoined because the State had not formally made an application for a temporary injunction against it. As for the TI's definitions of "waste" and "site," those definitions are substantially similar in both the agreed TI and the modified TI.[15] Appellants never objected to those definitions as overbroad before the trial court, either in response to the agreed TI or after the trial court signed the modified TI, and we note that appellants filed a proposed order modifying the agreed TI that did not seek to change those definitions. An argument that is not raised before the trial court is generally considered waived. *See* Tex. R. App. P. 33.1(a). This includes arguments related to the breadth of injunctive relief. *See DHJB Dev., LLC v. Graham*, No. 03-18-00343-CV, 2018 WL 5987150, at *4 (Tex. App.—Austin Nov. 15, 2018, pet. dism'd) (mem. op.) (party waived error where record did not show it "brought its complaints about the form of the temporary injunction to the trial court's attention and obtained a ruling"); *Ford v. Ruth*, No. 03-14–00460–CV, 2016 WL 1305209, at *2 (Tex. App.—Austin Mar. 31, 2016, pet. denied) (mem. op.) ("There is nothing in the record indicating that appellants contested venue or contended that the permanent injunction was overly broad in district court. Instead, they make these complaints for the first time on appeal and have, therefore, failed to preserve these issues

---

[15] The two documents define "site" identically, and the definition of "waste" is the same—"any liquid, gaseous, semisolid, or solid substances that result from any process of industry, manufacturing, trade, or business," including "materials that are accumulated, stored, or processed before or in lieu of being abandoned," except that the modified TI adds "including 'oil and gas waste' as defined in" the natural resources code and the administrative code.

36

for review."); *Emerson v. Fires Out, Inc.*, 735 S.W.2d 492, 494 (Tex. App.—Austin 1987, no writ) ("Although appellants did request the district court to reconsider the order, appellants did not raise the facial inadequacy of the order. Accordingly, appellants' motion did not preserve the error."). We hold that appellants waived any complaint related to the breadth of the TI's definitions.

Appellants similarly never complained to the trial court about the inclusion of Boundary Ventures in the TI. Moreover, there is no question that the trial court had jurisdiction over Boundary Ventures, the State specifically pled for permanent injunctive relief in its amended petition and included a plea for any other relief to which it was entitled, the State named Boundary Ventures as one of the enjoined defendants in its proposed order, and the water code and the natural resources codes specifically allow for permanent or temporary injunctive relief to address a party's statutory violations. *See* Tex. Water Code § 7.032(d); Tex. Nat. Res. Code § 91.003(a). We therefore overrule appellants' issue related to the inclusion of Boundary Ventures in the TI and overrule their sixth issue on appeal.

## CONCLUSION

We have overruled all of appellants' issues. We therefore affirm the trial court's modified temporary injunction.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed: January 6, 2022

37